## HARMON v. STATE OF INDIANA.

[No. 19,709.   Filed January 28, 1902.]

CRIMINAL LAW.—*Murder.*—*Self-Defense.*—*Instruction.*—In a prosecution for murder defendant sought to justify his act on the ground of self-defense. The evidence showed that some stones or cinders were thrown against defendant's house, and that defendant went out of the house to discover the persons who were throwing the stones, and stated to four young men, including deceased, that he had a shotgun in the house, loaded, and that he would use it on the persons throwing the stones; that defendant returned to the house, and, upon more stones being thrown, came out of the house with his gun, and shot and killed deceased. The court, in instructing the jury on the right of self-defense, stated that a person must, in the exercise of such right, act honestly, and might exercise a reasonable degree of force to repel an attack, "but must not provoke an attack in order that he may have an apparent excuse for killing his adversary." *Held,* that the instruction was not erroneous as being irrelevant to the evidence and the issues in the case. *pp. 37–45.*

SAME.—*Murder.*—*Self-Defense.*—*Instruction.*—An instruction in a prosecution for murder to the effect that if the evidence showed that the deceased and his companions on the night of the homicide "maliciously and mischievously" threw stones or cinders against the house where defendant resided, without intent to commit a felony, such conduct on their part would be merely a misdemeanor, followed by an instruction that if defendant was not assailed and was not in danger of great bodily harm, and had no reason to believe, and in fact did not believe, that his life was in danger, the shooting was not justifiable, is not open to the objection that it makes the law of self-defense depend upon the intent of the assailant rather than upon what the person assailed might believe was the intent or purpose of his assailant. *pp. 45–47.*

From Clay Circuit Court; *P. O. Colliver,* Judge.

Samuel Harmon was convicted of murder in the second degree, and he appeals. *Affirmed.*

*G. A. Knight* and *A. W. Knight,* for appellant.

*W. L. Taylor,* Attorney-General, *Merrill Moores* and *C. C. Hadley,* for State.

JORDAN, C. J.—Appellant, Samuel Harmon, was charged by indictment with having committed the crime of murder

in the first degree, by killing Charles Reynolds, at Clay county, Indiana, on the 27th day of October, 1900. A trial in the lower court resulted in a verdict of guilty of murder in the second degree, and fixing therein the punishment at imprisonment during life in the state prison. Over appellant's motion for a new trial, judgment was rendered on the verdict. The only questions which his counsel argue and rely upon for a reversal of the judgment relate to the sufficiency of the evidence to support it, and the giving of certain instructions.

An epitome or outline of the evidence as exhibited by the record is as follows: Appellant is a man sixty-three years old, whose health is shown to be somewhat infirm. He and his wife and minor daughter resided together in the same house in the city of Brazil, Clay county, Indiana. At the time of the homicide his wife, Mary Harmon, whose age is about that of her husband, was, and for about twelve years previous thereto had been, engaged in conducting the house, wherein she and her said husband resided, as a house of ill fame, wherein women were kept by her for the purpose of prostitution. The evidence discloses that appellant and his said wife and young daughter lived in this house with those who were kept therein as prostitutes, and that all ate at the same table; but it appears that appellant and his wife and daughter lived in apartments in the same house separate from the prostitutes. This house or resort was kept and conducted by Mrs. Harmon, and was known and denominated in and about the city of Brazil as the "Harmon house," and its evil reputation or character was well known in said community. On the night of October 27, 1900, about the hour of 11 o'clock, the deceased, Charles Reynolds, a young man of the age of 18 years, together with five other young men about the same age, went to the "Harmon house." The deceased and two of his companions, it appears, were admitted into the house through a rear door, but soon after gaining admittance, as testified to by Mrs. Harmon, they

were requested by her to leave; she saying to them that they were too young to be in such a place. They seem to have laughed at her request, but complied with it by leaving the house and joining their companions, who were waiting on the sidewalk. There is evidence to show that the deceased and his companions had been drinking beer before going to said house; and, while there is evidence tending to show that while at the house they were in a state of intoxication, still there is evidence disputing this charge. Soon after leaving the house, some stones or cinders were thrown against it. Appellant on the evening in question was not feeling well, and at the time these stones were thrown he was in his room, lying in bed. On hearing the stones strike the house, he arose and went out onto the front porch to discover the parties who were throwing the stones. Four of the young men in question, including the deceased, stepped up to the porch where appellant was then standing, and engaged in conversation with him; and, upon his inquiring who had thrown the stones, they all denied that they were the parties, but claimed or asserted that some persons had thrown stones, and that Reynolds, the deceased, had been hit by one of the stones so thrown. Appellant, while standing on the porch talking to these young men, remarked to them that he had a shotgun in the house, loaded, and that he would use it on the persons throwing the stones. One of the companions of the deceased, upon this statement of appellant, replied, he need not be afraid of his party throwing stones, as they had not thrown any, and would not do so. Appellant then, as it appears, returned to his room; and Reynolds and one of his companions went around to the side door of the house, and were again admitted. Mrs. Harmon testified that on this second occasion, upon the parties coming into the house that she ordered them out, and stated to them that, if she had to telephone for the police, that the "whole house would be pulled"; and this, it seems, she did not desire should take place. She stated that the young men then left the house,

but in going out they seemed to be angry. In respect to
these parties leaving the house on the order of Mrs. Harmon,
and in regard to their being angry at the time, and as to what
they said, the evidence is conflicting; there being evidence to
show that the deceased and his companions on both occa-
sions while in the house were orderly and peaceable, and
that they were neither angry nor intoxicated, and that
they left the house on their own accord, without being re-
quested by any one to do so. After departing from the
house the second time, and after they had been outside for a
short time, more stones or cinders were again thrown against
the house. Appellant thereupon got up from the bed where
he was lying, got his gun, which was loaded with buckshot,
and went out onto the porch, and from there went to the
front gate and out onto the sidewalk. The deceased at this
time, it appears, was standing on the sidewalk, near a high
board partition fence east of appellant's premises, and his
companions were standing out in the street. As appellant
came out of the house, the companions of the deceased, who
were standing in the street, ran down the street past where
the deceased was standing, near the partition fence. Appel-
lant came out onto the sidewalk with his gun, and went east
down the walk about fifteen feet, in the direction in which
the young men had run, and in the direction in which Rey-
nolds was standing, and then fired the gun, the entire con-
tents of which struck Reynolds in the back; and he fell to
the ground, on his face, and as he fell he uttered a cry of,
"Oh, boys"! After firing the fatal shot, appellant went into
the house, put up his gun, and then came over to where the
body of Reynolds had been taken by his companions. When
the deceased's companions heard the shot, and heard him cry
out, "Oh, boys"! they turned in their flight, and went back
in the direction of appellant's house, and found Reynolds
lying on his face, where he had fallen on the sidewalk, sev-
eral feet beyond said partition fence. Numerous buckshot
are shown to have entered his back, some forty-two of which,

as it appears, passed entirely through his body.   When found, he was gasping for breath, but could not speak.   He was carried by his companions a short distance, to a store, and laid upon some stone steps, where in a few minutes he died from the effects of the shot.   When appellant came over to where the deceased was lying dead, some one in the crowd said to him, "What did you shoot this boy for ?"   At first appellant said that he had not shot him, and, when it was asserted that he had shot him, he then replied, "I didn't aim to shoot him",—further saying that he aimed in the air; some one in the crowd, in response to this, saying, "It is funny, if you aimed in the air, how you shot a man in the back."   To this appellant made no reply.   After the homicide, when in jail in the city of Terre Haute, he said in an interview with a reporter for a newspaper of that city that the shooting was accidental.   As to whether any of the young men with whom the deceased was in company on the occasion in question threw any of the stones against appellant's house, the evidence is conflicting.   All of his companions, who testified on the trial, denied that any of their party threw the stones, upon the occasion in question, while, upon the contrary, there are evidence and circumstances tending to show that the stones or cinders were thrown by some of the parties who accompanied the deceased to the Harmon house on the night of the homicide.   There is evidence, also, showing that neither the deceased nor his companions, at the time the fatal shot was fired, were engaged in throwing stones at either the appellant or his house or in the direction of his house or where he was standing.   There is also evidence tending to show that when appellant came out of the house with his gun that he was in an angry mood, by reason of the stones having been cast against the house, and that by going out of the house he was endeavoring to discover who the parties were that had thrown the stones or cinders.   On the trial he claimed and attempted, by his evidence, to justify his act in shooting, on the ground of self-defense.   On direct exam-

ination he testified, in part, that, after the stones or cinders were thrown the second time, he got up from his bed and went out to the front gate; that it was quite dark and he could see no one. That as he stepped off the porch two cinders or stones were thrown past him, and that one of them just brushed the rim of his hat. He further testified: "I walked out to the gate, and looked, and I couldn't see any one but some parties down the sidewalk a piece. It was dark, and I couldn't tell who they were, or anything about that. Q. Now, after you got to the sidewalk, were there any cinders thrown? A. When I got on the sidewalk I stepped on a cinder. It kind of turned with me a couple steps, or three, and I kind of blundered; just about that time two more cinders passed my head. Q. Then what did you do? A. I was carrying the gun down in my left hand, hold of the middle of the stock or breech, and my finger was on the trigger; the other hand was about half way of the barrel. When them cinders passed my head I just brought the gun around, pulled the hammer back, and fired off. I didn't see anybody but some parties farther down. Q. I will ask you if you took aim at anybody? A. No, sir; I didn't take any aim at all. Q. I will ask you to tell the jury if you thought you were in danger? A. Yes, sir; I knew anybody that would cinder the house would cinder me. Q. Tell the jury if you then at that time thought you was in danger of being struck or injured by these cinders. A. Yes, sir; I did. Q. What did you do after you fired the gun? A. I turned around and went back." On cross-examination, when asked the question if the shooting was accidental, he stated that it was, and further said that he shot simply to "scare"; saying, "I intended to shoot so that I would not hurt anybody." He admitted that he saw some persons standing down in the street when he fired, and that he shot in the direction where they were standing, but stated that he did not know who they were, and again stated that at the time he fired the shot he feared and believed, under the circumstances, he was in

danger of great bodily harm. The accused in the lower court sought, and in this appeal seeks, to justify his action in firing the fatal shot on the ground, as previously said, of self-defense.

The court gave to the jury on its own motion a series of instructions in respect to the law of self-defense. The entire charge of the court is exhibited by the record, and the instructions which relate to the question of self-defense are numbered from twelve to eighteen, inclusive. By instructions twelve, thirteen, fourteen, fifteen, and sixteen, the court advised the jury in a general way in regard to the rules of law which pertain to and control the actions of persons in the exercise of the right of self-defense. These, counsel for appellant concede, correctly state the law and are applicable, except number sixteen, which they criticise and condemn in part, as not being relevant to the evidence, and insist that, by the giving of the latter part of this instruction, appellant was thereby prejudiced and harmed in his defense. Instruction number sixteen is as follows: "The right of self-defense is allowed to the citizen as a shield, and not as a sword, and in the exercise of this right a party must act honestly. A person assaulted may exercise a reasonable degree of force to repel an attack, but must not provoke an attack in order that he may have an apparent excuse for killing his adversary." The particular part of this instruction which appellant complains of is the clause, "but must not provoke an attack in order that he may have an apparent excuse for killing his adversary." There is no contention that the instruction, so far as pertinent, is not a correct enunciation of the law pertaining to self-defense, provided there was evidence in the case applicable thereto. The insistence is that the part complained of is not relevant to any evidence in the case, and that thereby the jury must have been confused and misled. It is claimed that the jurors by reason thereof were given to believe that the court thought there was evidence tending to show that appellant had provoked the deceased or

his companions to throw the stones or cinders at him, which were thrown, as stated, just previous to his firing the fatal shot. Upon this question counsel assert that all that the evidence upon this point can be said to show is that the accused came out of his house with his gun, and walked out to the sidewalk, immediately preceding the shooting; and that in so doing, it is said, he can in no manner be held to have provoked the assault upon himself, or in any manner became the aggressor. On the contrary, counsel for the State insist that there is evidence which shows that appellant, after the stones or cinders had been cast against the house, came out, armed with a loaded shotgun, which he had previously threatened to use upon any one who threw stones at the house; that it is further disclosed that he not only came onto the porch with his gun, but that he started in pursuit of the deceased and his companions, who were out in the public street, in a place where they had a right to be; that, under such circumstances, by his conduct he placed himself in the attitude of being aggressive, and by his acts tended, at least, to provoke the parties to throw the stones at him, which he claimed were thrown just before the shot was fired. There is evidence in the record which has a bearing upon this point, but as to its weight, or as to what extent it tends to support the State's contention, we need not determine in our review of the question in relation to the propriety of the latter part of instruction sixteen. The issue which appellant tendered was that the homicide was justifiable on the ground of self-defense.

By instruction sixteen the trial court stated a general rule of the law pertaining to the exercise of the right of self-defense. The doctrine asserted by the decisions of this court is that the instructions of the court in a cause should be relevant to the issues and applicable to the evidence, and where it is made to appear that they were given in violation of this rule, and thereby tended to harm or prejudice the complaining party in some of his substantial rights, the judgment, on

appeal, will be reversed. *Reed* v. *State,* 141 Ind. 116, and authorities there cited.

The rule, however, which asserts that instructions should be applicable to the evidence, can not be construed so as to hold that it prevents the trial court from stating correctly to the jury the law relevant to the issues made or tendered by the parties. Again, unless there is an entire absence of evidence on an issuable fact, it can not be said that an instruction on that issue is improper, on the ground that it is not applicable to the evidence. Certainly it can not be insisted that the instruction in dispute was devoid of any relevancy to either the issues or the evidence in this case, and it is not apparent, under the circumstances, that the jury was thereby confused or misled in arriving at their verdict, to the harm or prejudice of the accused in any of his substantial rights; and the contention of his learned counsel, when tested by the rule stated, must be denied.

By instruction seventeen the court advised the jury that, if they found from the evidence that the deceased and his companions on the night of the homicide "maliciously and mischievously" threw stones or cinders against the house where appellant resided, thereby injuring the same, but without any purpose or intent by them, or either of them, to commit a felony on his person, or on his property or habitation, or on some member of his family, or upon some inmate of his house, and that no felony was committed or attempted to be committed by the deceased and others, then such conduct on their part would be merely a misdemeanor. Following this instruction, the court further summed up and charged the jury, by instruction eighteen, that, if they found from the evidence that appellant on the occasion of the homicide was not assailed, and was not in danger of great bodily harm, and that no attempt had been made by the deceased or by those associated with him on the occasion in question to commit a felony on appellant's property or on his habitation by surprise or violence, and that no attempt had been made to com-

mit a felony on some part of his family or inmate of his res-
idence, and that he had no reason to believe, and in fact did
not believe, that his life was in danger, or that he was in dan-
ger of great bodily harm, and that he did not believe, and
had no reason to believe, that an attempt had been made to
commit a felony on his property or habitation by surprise
or violence, or that an attempt had been made to commit a
felony on some member of his family or inmate of his house;
that he saw some persons on the sidewalk, and fired his gun
in the direction of such persons, with the intent to frighten
them, and thereby killed the deceased,—then, if such facts
were found to be true beyond a reasonable doubt, the shoot-
ing, under such circumstances, would not be justifiable.

The court by other instructions had fully stated to the jury
the rules of law pertaining to the issue of self-defense as
raised by the accused. By instructions seventeen and eight-
een the court seems to have advised the jury in regard to the
theory which the State, in reason, must have advanced and
contended for under the evidence. Certainly, if the jury
found from the evidence, beyond a reasonable doubt, that
there was an absence of the facts, as stated and summed up
by the court in instruction eighteen, and that the accused,
under the circumstances, fired the shot in the direction of
the deceased and his associates, not in self-defense, but sim-
ply for the purpose of frightening them, his action in so do-
ing, under the law, could not be justified. It can not be
asserted that the instruction is open to the objection urged
by counsel, that it makes the law of self-defense depend upon
the intent of the assailant, rather than upon what the person
assailed might believe was the intent or purpose of his
assailant.

The trial court by other instructions advised the jury un-
der what circumstances one was authorized to exercise his
right of self-defense, stating fully in its charge that the dan-
ger apprehended at the time might be either actual or only
apparent.

The claim made by appellant's counsel that, under instruction seventeen, appellant was deprived of the benefit of the rule which asserts that apparent danger is sufficient, is without force. While instructions seventeen and eighteen are not models in their construction, nothing therein contained, under the facts in this case, can be said to afford the accused any grounds for complaint. In fact, when the court's charge is considered in its entirety, as it must be, it stated the law, under the evidence, quite favorably to appellant.

We have read and fully considered the voluminous evidence contained in the record, and find that it fully supports the verdict of the jury and judgment of the court on every material point. The judgment below is therefore affirmed.